[Cite as *Toledo Edison Co. v. Bd. of Defiance Cty. Commrs.*, 2013-Ohio-5374.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

THE TOLEDO EDISON COMPANY,

    PLAINTIFF-APPELLEE,                   CASE NO. 4-13-04

    v.

BOARD OF DEFIANCE COUNTY
COMMISSIONERS, ET AL.,                   O P I N I O N

    DEFENDANTS-APPELLANTS.

Appeal from Defiance County Common Pleas Court
Trial Court No. 12-CV-41752

Judgment Reversed and Cause Remanded

Date of Decision: December 9, 2013

APPEARANCES:

    *Frank J. Reed, Jr. and Brian W. Fox* for Appellants,
Defiance County Commissioners

    *Frederick A. Vierow*, Amicus Curiae County Engineers
        Association of Ohio

    *Emily Ciecka Wilcheck* for Appellee, Toledo Edison Company

**PRESTON, P.J.**

{¶1} Defendants-appellants, Board of Defiance County Commissioners and Defiance County Commissioners James E. Harris, Jr., Thomas L. Kime, and Otto Nicely (hereinafter collectively "commissioners"), appeal the Defiance County Court of Common Pleas' decision vacating Resolution No. 12-01-058 ordering plaintiff-appellee, The Toledo Edison Company ("Toledo Edison"), to remove and relocate several of its utility poles located within the county-owned rights-of-way[1] along Harding and Bend Roads in Defiance County, Ohio pursuant to R.C. 5547.03. For the reasons that follow, we reverse.

{¶2} In 2005, the commissioners widened Bend Road from State Route 15 to the Defiance and Williams County line. Toledo Edison owns 38 utility poles at this location—the closest is four feet from the edge of the pavement and the furthest is eleven feet, four inches from the edge of the pavement. (Ex. B).[2] In 2007, the commissioners widened Harding Road between Watson Road and the Defiance City limits. Toledo Edison owns 22 utility poles at this location—the closest is six feet, two inches from the edge of the pavement and the furthest is fifteen feet, six inches from the edge of the pavement. (*Id.*). For spring 2012, the commissioners planned a bridge replacement project on Bend Road north of Mud

---

[1] "Right-of-way" is defined as "[a] general term denoting land, property, or the interest therein, usually in the configuration of a strip, acquired for or devoted to transportation purposes. When used in this context, right-of-way includes the roadway, shoulders or berm, ditch, and slopes extending to the right-of-way limits under the control of the state or local authority." R.C. 4511.01(UU)(2).

[2] The commissioners' December 15, 2011 letter to Toledo Edison reflects that the number of utility poles at this location is 37. (Doc. No. 5, Ex. A).

Creek, affecting 10 of Toledo Edison's utility poles—the closest is four feet, nine inches from the edge of the pavement and the furthest is ten feet, two inches from the edge of the pavement. (*Id.*).[3]

{¶3} The commissioners requested that Toledo Edison relocate its utility poles further away from the edge of the roadway for safety and snow removal, but Toledo Edison refused. (*Id.*). Other companies affected by the roadway improvements, including AEP, Northwest Electric, and Embarq, complied with the commissioners' request to move their utility poles and lines. (Ex. A). Toledo Edison, on the other hand, claimed that its utility poles were "not obstructions and * * * [did] not interfere or conflict with the improved highway," relying on *Turner v. Ohio Bell Tel. Co.*, 118 Ohio St.3d 215, 2008-Ohio-2010. (*Id.*).

{¶4} On December 15, 2011, the commissioners notified Toledo Edison by certified mail that they would hold a hearing on January 23, 2012 to determine whether to order it to remove its utility poles pursuant to R.C. 5547.03 and 5547.04. (Doc. No. 5, Ex. A).

{¶5} At the January 23, 2012 hearing, County Engineer Warren Schlatter informed the commissioners that Toledo Edison's utility poles were located too close to the edge of the roadway, as widened, and were not in compliance with federal and state guidelines. (Ex. A). Schlatter also indicated that the utility poles

---

[3] The commissioners' December 15, 2011 letter to Toledo Edison reflects that the number of utility poles at this location is nine. (Doc. No. 5, Ex. A). At oral argument, the parties indicated that this project is now complete.

were negatively affecting the County's ability to plow snow to reduce drifting, because the plow trucks were unable to use the entire shoulder of the road. (*Id.*).

**{¶6}** Toledo Edison did not present any testimony at the hearing, but instead, counsel argued that Toledo Edison was willing to move its utility poles but not at its cost. (*Id.*). Toledo Edison again maintained that the utility poles were not "obstructions" in the roadways in light of *Turner*, 2008-Ohio-2010. Toledo Edison also submitted a booklet containing various case citations and diagrams showing the distances from the edge of the road and the white edge line for each of the affected utility poles. (Ex. B).

**{¶7}** The commissioners found that the utility poles were obstructions under R.C. 5547.03 and enacted Resolution No. 12-01-058, which ordered Toledo Edison to relocate its 70 utility poles along Harding and Bend Roads to locations approved by the county engineer. (Ex. A); (Doc. No. 1, attached).

**{¶8}** On February 8, 2012, Toledo Edison appealed Resolution No. 12-01-058 to the Defiance County Court of Common Pleas pursuant to R.C. 307.56 and 2506. (Doc. No. 1). That same day, Toledo Edison also filed a motion to stay execution of the resolution pending the administrative appeal, which the trial court granted on May 23, 2012. (Doc. Nos. 2, 10).

**{¶9}** The parties briefed their respective positions on Resolution No. 12-01-058. (Doc. Nos. 9, 11, 14). Toledo Edison argued that the resolution was not

supported by a preponderance of substantial, reliable, and probative evidence presented at the hearing, and that the resolution amounted to an invalid taking under the Ohio Constitution. (Doc. No. 9). The commissioners, on the other hand, argued that they validly passed the resolution pursuant to R.C. 5547.03 based upon substantial evidence presented at the hearing and not in violation of the Takings Clause. (Doc. No. 11).

{¶10} On April 23, 2013, the trial court determined that Toledo Edison's utility poles were not "obstructions," because they would not "incommode or interfere with the usual and ordinary course of travel," relying on *Turner*, 2008-Ohio-2010, and vacated Resolution No. 12-01-058. (Doc. No. 17).

{¶11} On May 14, 2013, the commissioners filed a notice of appeal. (Doc. No. 18). The commissioners, joined by amicus curiae The County Engineers Association of Ohio, raise three assignments of error for our review. We elect to address the first and third assignments of error together since they are dispositive.

### Assignment of Error No. I

**The trial court erred by finding that the commissioners' decision to pass the resolution was not supported by a preponderance of reliable, probative, and substantial evidence.**

### Assignment of Error No. III

**The trial court erred by misstating the legal standard for passing the resolution, pursuant to R.C. 5547.03.**

{¶12} In their first assignment of error, the commissioners argue that their decision was based on a preponderance of substantial, probative evidence that Toledo Edison's utility poles were closer to the roadway than both the American Association of State Highway and Transportation Officials' (AASHTO) Manual and the Ohio Department of Transportation (ODOT) Location and Design Manual allow and impeded the County's ability to maintain the roadways; and therefore, the utility poles were "obstructions" under R.C. 5547.03.

{¶13} In their third assignment of error, the commissioners argue that the trial court erroneously relied on *Turner v. Ohio Bell Tel. Co.* to narrow the common, ordinary meaning of "obstruction" in R.C. 5547.03. The commissioners argue that *Turner* concerned a telephone company's tortious liability stemming from an automobile accident; whereas, this case concerns the commissioners' duty to ensure the roadways are obstruction-free pursuant to R.C. 5547.03.

{¶14} A person aggrieved by a decision of a board of county commissioners may appeal to the common pleas court under Chapter 2506. R.C. 307.56. Likewise, R.C. 2506.01(A) provides that "every final * * * decision of any * * * board * * * of any political subdivision of the state may be reviewed by the court of common pleas of the county in which the principal office of the political subdivision is located."

{¶15} When reviewing the board's judgment, the common pleas court must consider the "'whole record,' including any new or additional evidence admitted under R.C. 2506.03, and determine whether the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147 (2000).

{¶16} "A court of common pleas should not substitute its judgment for that of an administrative board * * * unless the court finds that there is not a preponderance of reliable, probative and substantial evidence to support the board's decision." *Kisil v. City of Sandusky*, 12 Ohio St.3d 30, 34 (1984). "The key term is 'preponderance.' If a preponderance of reliable, probative and substantial evidence exists, the Court of Common Pleas must affirm the agency decision; if it does not exist, the court may reverse, vacate, modify or remand." *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207 (1979).

{¶17} In contrast, "[t]he standard of review to be applied by the court of appeals in an R.C. 2506.04 appeal is '*more limited* in scope.'" *Henley* at 147, quoting *Kisil* at 34 (emphasis sic). The Court of Appeals reviews the judgment of the common pleas court only for "questions of law," which does not include the same extensive power to weigh "the preponderance of substantial, reliable and probative evidence," as is granted to the common pleas court. *Id.*, quoting *Kisil* at

34, fn. 4. "It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. * * * The fact that the court of appeals * * * might have arrived at a different conclusion than the administrative agency is immaterial." *Henley* at 147, quoting *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261 (1988). An appellate court must affirm the trial court's decision, unless it finds, as a matter of law, that the lower court's decision is not supported by a preponderance of reliable, probative and substantial evidence. *Kisil* at 34.

{¶18} Administrative appeals under R.C. 2506.04 are reviewed under an abuse-of-discretion standard. *Briggs v. Dinsmore Twp. Bd. of Zoning Appeals*, 161 Ohio App.3d 704, 2005-Ohio-3077, ¶ 7 (3d Dist.). "Abuse of discretion" implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See also Armstead v. Lima City Bd. of Edn.*, 75 Ohio App.3d 841, 843 (3d Dist.1991) ("Within the ambit of 'questions of law' for appellate court review would be abuse of discretion by the common pleas court." (emphasis and internal quotation marks omitted)), quoting *Kisel* at 34, fn. 4.

{¶19} After reviewing the testimony and record from the January 23, 2012 public hearing, the trial court determined that Resolution No. 12-01-058 was not supported by substantial, reliable, and probative evidence. (Apr. 23, 2013 JE,

Doc. No. 17). In reaching that conclusion, the trial court framed the "dispositive issue" as "whether the Board of County Commissioners, or the County Engineer, has unlimited discretion to determine the existence of an obstruction and order its removal." (*Id.*). The trial court answered this inquiry in the negative based upon the concept of an administrative appeal found in Chapter 2506. (*Id.*). It concluded that the "reliable, substantial and probative evidence" standard must be "defined with reference to the applicable legal standards, be they pronouncements of the Ohio Supreme Court or enactments of the legislature." (*Id.*).

{¶20} This case ultimately concerns the scope of authority the State delegated to boards of county commissioners—here, the Board of Defiance County Commissioners—in R.C. 5547.03 to remove obstructions and other interferences from county highways. *Geauga Bd. of Commrs. Munn Rd. Sand & Gravel*, 67 Ohio St.3d 579, 582-583 (counties may exercise only those powers affirmatively granted by the Ohio General Assembly); Article X, Section 1, Ohio Constitution.[4] The answer to this question requires an interpretation of R.C. 5547.03 and, specifically, the word "obstruction." The interpretation of a statute and undefined statutory terms are questions of law reviewed de novo on appeal. *Riedel v. Consol. Rail Corp.*, 125 Ohio St.3d 358, 2010-Ohio-1926, ¶ 6; *Hewitt v.*

---

[4] There is no indication that Defiance County is an Article X, Section 3 home-rule county. Our research indicates that only Cuyahoga and Summit Counties have adopted a charter pursuant to this section. *See Green v. Cuyahoga Cty.*, 195 Ohio App.3d 768, 2011-Ohio-5493, ¶ 12-13 (8th Dist.); *Akron-Canton Chapter of Am. Subcontractors Assn. v. Morgan*, 9th Dist. Summit No. 10724, 1982 WL 2727 (Sept. 1, 1982). *See also* Cianca, *Home Rule in Ohio Counties: Legal and Constitutional Perspectives*, 19 U. Dayton L.Rev. 533 (1994).

*L.E. Myers Co.*, 134 Ohio St.3d 199, 2012-Ohio-5317, ¶ 31. To interpret a statute, we begin with its plain language. *Horsely v. United Ohio Ins. Co.*, 58 Ohio St.3d 44, 45 (1991).

{¶21} R.C. 5547.03 provides, in relevant part:

[A] All * * * corporations using or occupying any part of a highway [or] bridge * * * with * * * electrical * * * mains, conduits, or any object or structure, other than by virtue of a franchise legally granted, shall remove from the bounds of such highway * * * their poles and wires * * * when, in the opinion of the board of county commissioners, they constitute obstructions in any highway, other than the state highway system; or the bridges or culverts thereon, or interfere or may interfere with the proposed improvement of such highways, bridges, or culverts or the use thereof by the traveling public. By obtaining the consent and approval of the board, such persons, partnerships, and corporations may relocate their properties within the bounds of such highways, bridges, or culverts in such manner as the board prescribes. The giving of such consent and approval by the board does not grant any franchise rights.

[B] Persons, partnerships, or corporations occupying any part of a highway, bridge, or culvert, under and by virtue of a franchise

legally granted, shall relocate their properties within the bounds of such highway, bridges, or culverts when in the opinion of the county engineer, they constitute obstructions or interfere with the construction, improvement, maintenance, or repair of such highways, bridges, or culverts, or the use thereof by the traveling public.

[C] If, in the opinion of the engineer, such * * * companies have obstructed any such highway, bridges, or culverts, or if any of their properties are, in his opinion, so located that they do or may interfere with the proposed improvement, maintenance, or repair the board shall notify such * * * corporation directing the removal or relocation of the obstruction or property, and, if they do not within five days proceed to so remove or relocate and complete the removal or relocation within a reasonable time, the board may do so by employing the necessary labor. The expense incurred shall be paid in the first instance out of any moneys available for highway purposes, and not encumbered for any other purpose, and the amount shall be certified to the proper officials to be placed on the tax duplicate against the property of such person, partnership, or corporation, to be collected as other taxes and in one payment, and the proper fund

shall be reimbursed out of the money so collected, or the account thereof may be collected from such person, partnership, or corporation by civil action by the state on the relation of the board. [5]

{¶22} R.C. 5547.03 provides two different procedures for the removal or relocation of objects or structures constituting obstructions or interferences depending upon the person or entity's right to use or occupy the highway, bridge, or culvert. Persons or entities using or occupying "other than by virtue of a franchise legally granted" fall under Division [A]; whereas, those using or occupying "under and by virtue of a franchise legally granted" fall under Divisions [B] and [C]. Toledo Edison's right to use or occupy the right-of-way falls under the first category, so Division [A] applies. (Ex. C, Pg. 6); (Doc. No. 9, Pg. 5); (Appellee's Brief at 4).

{¶23} Division [A] is divided into two independent clauses, both modified by "in the opinion of the board of county commissioners" providing justifications for the removal of objects or structures occupying any part of a highway, bridge, or culvert: [1] "* * * they constitute obstructions * * *, or" [2] "[they] interfere or may interfere with the proposed improvement of such highways, bridges, or culverts or the use thereof by the traveling public." The second clause is divided into two sub-clauses: [a] "interfere or may interfere with the proposed

---

[5] For clarity, we have designated the paragraphs within the statute as divisions "A," "B," and "C."

improvement of such highways, bridges, or culverts"; and, [b] "or the use thereof by the traveling public." Sub-clauses [a] and [b] are related because they are separated by the word "or" with no comma, and "thereof" in sub-clause [b] refers to "such highways, bridges, or culverts" in sub-clause [a]. The phrase "such highways, bridges, or culverts," in turn, refers to highways, bridges, or culverts with any object or structure thereon. Sub-clause [b], therefore, can be reworded "or the use [of highways, bridges, or culverts with any object or structure thereon] by the traveling public."

{¶24} Synthesizing all of these clauses together, R.C. 5547.03[A] authorizes the board of county commissioners to order the removal of objects or structures if, in its opinion, the objects or structures: (1) "constitute obstructions in any highway * * * or the bridges or culverts thereon"; (2) "interfere or may interfere with the proposed improvements of * * * highways, bridges, or culverts [with any object or structure thereon]"; or (3) "interfere or may interfere" with "the use [of highways, bridges, or culverts with any object or structure thereon] by the traveling public."[6] Because these clauses are separated by the term "or," each of these reasons serves as an independent justification for a removal order.

---

[6] At oral argument, Toledo Edison argued that "interfere or may interfere" modifies the phrase "with the proposed improvement of such highways, bridges, or culverts" only. We disagree. To read the statute in that manner leaves the phrase "or the use thereof by the traveling public" without a verb and converts it into a dangling modifier. The more reasonable interpretation is that the second clause of R.C. 5547.03[A] has two sub-clauses—the first related to improvements, and the second related to the traveling public's use of highways, bridges, and culverts, generally.

{¶25} Because the commissioners called Toledo Edison's utility poles "obstructions" throughout the proceedings and in Resolution No. 12-01-58, Toledo Edison concluded that the commissioners relied on R.C. 5547.03[A][1] above. (Ex. B); (Ex. C, Pgs. 1, 6); (Doc. No. 1). Consequently, Toledo Edison argued in the prior proceedings that their utility poles were not "obstructions" under R.C. 5547.03, relying on *Turner v. Ohio Bell Tel. Co.*, 118 Ohio St.3d 215, 2008-Ohio-2010. The trial court agreed and apparently relied on *Turner* to conclude that the record did not contain a preponderance of substantial, reliable, and probative evidence supporting Resolution No. 12-01-58.

{¶26} We must first address the application of *Turner* here. In that case, Bryan Little struck Bell Telephone Co.'s utility pole—located two feet, five inches from the berm and three feet, nine inches from the white edge line—with his vehicle, killing his passenger, Robert Turner. 2008-Ohio-2010, at ¶ 1.

{¶27} Turner's estate sued Ohio Bell and other utility companies alleging, in relevant part, that they were negligent in placing, maintaining, and continuing to use the utility pole because it was too close to the highway. *Id.* at ¶ 2. The utility companies filed motions for summary judgment. *Id.* Turner's estate opposed the motions, submitting expert affidavits of an accident reconstructionist, a civil engineer, and an environmental engineer who opined that the utility pole was unreasonably close to the highway. *Id.* at ¶ 3. The trial court granted the utility

companies summary judgment, concluding that the pole was not placed on the traveled and improved portion of the highway nor in such close proximity to the roadway to constitute an obstruction dangerous to anyone properly using the highway. *Id.* at ¶ 4.

**{¶28}** The Court of Appeals for the Eighth District reversed, concluding that a jury should determine the reasonableness of the utility pole's location. *Id.* at ¶ 5. The appellate court determined that "'liability may be imposed where the placement of a pole in close proximity to the edge of a roadway constitutes a foreseeable and unreasonable risk of harm to users of the roadway.'" *Id.* at ¶ 5, quoting *Turner v. Ohio Bell Tel. Co.*, 8th Dist. Cuyahoga No. 87541, 2006-Ohio-6168, ¶ 17. The Eighth District created an eight-factor test for the fact-finder to determine the reasonableness of the utility pole's location, including: (1) the narrowness and general contours of the road, (2) the presence of sharp curves in the road, (3) the illumination of the pole, (4) any warning signs of the placement of the pole, (5) the presence or absence of reflective markers, (6) the proximity of the pole to the highway, (7) whether the utility company had notice of previous accidents at the location of the pole, and (8) the availability of less dangerous locations. *Id.* at ¶ 15, citing *Turner*, 2006-Ohio-6168, at ¶ 18.

**{¶29}** The utility companies appealed, and the Supreme Court of Ohio reversed, holding:

> \* \* \* when a vehicle collides with a utility pole located off the improved portion of the roadway but within the right-of-way, a public utility is not liable, as a matter of law, *if* the utility has obtained any necessary permission to install the pole *and* the pole does not interfere with the usual and ordinary course of travel.

*Id.* at ¶ 21 (emphasis added). To reach this holding, the Court in *Turner* first recognized public utilities' general, qualified right to place utility poles within the public road right-of-way. *Id.* at ¶ 7, citing 45 Ohio Laws 34. However, the Court observed that public utilities' right to do so was originally limited by a single condition: "that the utility poles not incommode the public in the use of the roads or highways." *Id.* The Court then recognized that, today, public utility companies must obtain approval from the public entity that owns the right-of-way prior to erecting poles and other fixtures upon the public right-of-way. *Id.*, citing R.C. 4939.03 (municipalities), 5547.03 (counties), and 5515.01 (the State). The Court stated that, in the case of State highways, approval may be granted only when the use "will not incommode the traveling public." *Id.*, citing R.C. 5515.01. Consequently, the issue presented, according to the Court, was: "when does a utility pole incommode the public in the use of the roads or highways?" *Id.* at ¶ 8.

{¶30} After reviewing its prior, relevant precedent, the Court in *Turner* found that, collectively, the Court's precedent recognized the public's right to use

the highway to the entire width of the right-of-way against all others using the highway for private purposes. *Id.* at ¶ 9-12. On the other hand, the Court noted that the traveling public is not free to drive on the right-of-way "as he or she pleases"; rather, the public's right to use the highway extends only to the portion of the roadway normally used for vehicular traffic—that is, as nearly as practicable within the marked lanes. *Id.* at 12-19, citing R.C. 4511.33.

{¶31} Utility companies, according to the Court, do not have unfettered discretion to determine the placement of their utility poles, but rather, are required to obtain approval from the owner of the right-of-way, i.e. the public authority. *Id.* at ¶ 20. The public authority would presumably use many of the factors outlined in the Eighth District's reasonableness test when deciding whether to approve a utility pole's location, stated the Court. *Id.* The Court then noted that "[p]lacement that complies with the requirements of the public authority that owns the right of way is indicative that the object is not an obstacle to the traveling public." *Id.*

{¶32} The trial court's reliance on *Turner* to define "obstruction" in R.C. 5547.03 was an error of law. The holding in *Turner* is essentially this: *if* (1) the public utility company has obtained any necessary permission to install its pole, and (2) the pole does not interfere with the usual and ordinary course of travel, *then* the public utility company is not liable, as a matter of law, when a vehicle

collides with its utility pole located off the improved portion of the roadway but within the right-of-way. 2008-Ohio-2010, at ¶ 21. Toledo Edison's argument, on the other hand, is essentially: *if* (1) the utility pole is located off the improved portion of the roadway, *then* (1) it does not interfere with the usual and ordinary course of travel, and (2) it is not an obstruction under R.C. 5547.03. Toledo Edison's argument does not follow from *Turner*. That the utility pole is located off the improved portion of the roadway is a necessary but not a sufficient condition to ensure that it is not an obstacle to the traveling public. Many of the factors the Ohio Supreme Court in *Turner* recognized as relevant for the public authority's approval relate to things other than this necessary fact. *Id.* at ¶ 15, 20.

{¶33} Furthermore, *Turner* interpreted "incommode" in R.C. 5515.01, not "obstruction" in R.C. 5547.03, and the issue in *Turner* was categorically different than here. *Turner* concerned the liability of a utility company for the death of an automobile passenger whose automobile collided with one of its utility poles that was located off the improved portion of the highway within the right-of-way **with the public authority's approval**. *Turner* did not concern the director of transportation's authority under R.C. 5515.02 to order the removal of the utility pole—a similar issue to that presented here. Simply stated, *Turner* does not define "obstruction" in R.C. 5547.03, does not concern the same issue as this case, and does not compel the result Toledo Edison seeks.

{¶34} The term obstruction is not defined in the statute; therefore, it must be accorded its common, ordinary meaning. *City of South Euclid v. Richardson*, 49 Ohio St.3d 147, 152 (1990), citing *State v. Young*, 37 Ohio St.3d 249, 252 (1988). The common, ordinary meaning of "obstruction" is "something that obstructs or impedes." *Webster's Third New International Dictionary* 1559 (2002). *See also Black's Law Dictionary* 1183 (9th Ed.2009) ("Something that impedes or hinders."). "Obstruct," in turn, means "to block up, stop up or close up; place an obstacle in or fill with obstacles or impediments to passing." *Webster's* at 1559. "Impede" means "to interfere with or get in the way of the progress of." *Id.* at 1132. "Hinder" is defined: "to make slow or difficult the course or progress of." *Id.* at 1070. These definitions are broader than "incommode" interpreted in *Turner*, and R.C. 5547.03 increases their breadth by modifying the term "obstruction" with the phrase "in the opinion of the board of county commissioners." Utility poles located within right-of-way can "interfere with" or "make difficult" the use of the highway for the traveling public.

{¶35} Implicit in Toledo Edison's argument—as evidenced by its exclusive reliance upon *Turner*—is that an object is not an "obstruction" under R.C. 5547.03 unless it obstructs the ability of motorists to safely travel the road. As we noted above, *Turner*, itself, does not support this argument. This is also the same argument the Court of Appeals rejected in *Steigerwald v. Branagan*, 7th Dist.

Jefferson No. 07 JE 25, 2008-Ohio-1528. In that case, the county commissioners, pursuant to R.C. 5547.04, ordered private property owners to remove a fence and trees they placed within the right-of-way and two feet from the edge of the road. *Id.* at ¶ 3. After the landowners refused, the county engineer removed the fence and trees, and the county auditor assessed the property $1,296.79 for the cost of the removal, both procedures provided for in R.C. 5547.03. *Id.* at ¶ 11-12. Afterwards, the property owners sued the county commissioners arguing, in pertinent part, that "obstruction" in R.C. 5547.04 means that the object(s) must obstruct the ability of motorists to safely travel on the road. *Id.* at ¶ 38-39. The trial court disagreed.

{¶36} On appeal, the landowners agreed that "obstruction" must be given its common, ordinary meaning and cited Black's Law Dictionary to define "obstruction" as: "a hindrance, obstacle, barrier or an object that delays, impedes or hinders." *Id.* at ¶ 38. Nevertheless, the landowners argued that R.C. 5547.04 prohibited only objects that obstruct the ability of motorists to safely travel on the road. *Id.* at ¶ 38. The appellate court disagreed, stating:

R.C. 5547.04 * * * make[s] no mention of obstructing traffic. Rather, the bare term obstruction is used. Thus, if the highway, including its right of way, is hindered or occupied by an obstacle, then R.C. 5547.04 applies. In its plain and ordinary sense, the

statute would include a fence and trees as being obstructions as they are obstacles and barriers existing within the undisputed right of way.

*Id.* The appellate court also observed that the landowners' neighbor had difficulty pulling out of his driveway because the fence and trees obstructed his view of traffic. *Id.* at ¶ 42. Lastly, the appellate court noted that the landowners failed to rebut the county's claim that their solid, six-foot-tall fence located two feet off a curved roadway (on the downward hill side) impaired snow removal. *Id.*

{¶37} *Steigerwald* is persuasive here. The appellate court's interpretation of "obstruction" in *Steigerwald* is consistent with its common, ordinary meaning. The statutes at issue in *Steigerwald* and here are similarly worded: R.C. 5547.04 refers to the removal of "obstructions within the bound of the highway"; R.C. 5547.03 refers to the removal "from the bounds of such highway * * * [any object or structure] when, in the opinion of the county commissioners, they constitute obstructions in any highway * * *." Neither statute limits the word obstruction in terms of vehicular traffic. If anything, "obstruction" in R.C. 5547.03 should be given a *broader* meaning than in R.C. 5547.04 since it is modified in the former statute by the phrase "in the opinion of the board of county commissioners." Additionally, both R.C. 5547.03 and 5547.04 govern the same subject—the county

commissioners' authority to remove obstructions from "the bounds of the highways." *See* R.C. 1.49(D).

**{¶38}** Although not binding on this Court, the Ohio Attorney General has also concluded that the General Assembly intended "obstruction" in R.C. 5547.04 to have "a very broad meaning." 1980 Ohio Atty.Gen.Ops. No. 80-043, 1980 WL 117378, *3. The Attorney General opined, in relevant part, that "obstruction" in R.C. 5547.04's first paragraph "is not limited to something that interferes with the flow of traffic on the highway or with the construction or repair of the highway." *Id.* Reading the statute as a whole, the Attorney General opined:

> * * * the General Assembly intended that the word 'obstruction' have a very broad meaning. In order to give effect to this intention of the General Assembly, it appears that 'obstruction' is any object that has the potential of include [sic] virtually any object within the bounds of a highway that has been 'placed' or 'erected' there. In other words, an 'obstruction' is any object that has the potential of interfering with the highway easement. An object could interfere with the easement without hindering the flow of traffic or the construction or maintenance of the highway. Whether an object interferes with the easement will depend upon the nature of the object, its size, and its precise location.

*Id.* Because R.C. 5547.03 and 5547.04 are similarly worded and govern similar subjects, there is no reason to interpret "obstruction" in R.C. 5547.03 less broadly than in 5547.04. *See* R.C. 1.49(D).

{¶39} In an analogous context, the Court of Appeals has characterized the State director of transportation's authority to remove obstructions in the State highways, bridges, and culverts pursuant to R.C. 5515.02 as a judgment by a public official with which a court should not interfere absent fraud or gross abuse of discretion. *Lamborn v. Wray*, 2d Dist. Clark No. 95-CA-0028, 1996 WL 144196, *4 (Mar. 29, 1996). In *Lamborn*, private landowners sought to enjoin the director from removing 40 arborvitae shrub seedlings they planted in their front yard along U.S. Route 40. *Id.* at *1. The trial court granted the director summary judgment and permitted the removal of the shrubs based on the affidavits of a survey supervisor and an operations engineer, both of whom worked for the State department of transportation. *Id.*

{¶40} The survey supervisor averred that the landowners planted two rows of shrub seedlings eleven feet from the edge of the pavement, with the right-of-way line being twelve feet to the north of the seedlings. *Id.* He further averred that one row of seedlings was planted at the bottom (flow-line) of the highway's drainage ditch, and the second row was planted near the back slope of the drainage ditch. *Id.* The engineer averred that, while the seedlings were only a few inches

high and not currently a problem, the seedlings would mature to 10 to 12 feet in height and "problems could arise." *Id.* The engineer opined that, once mature, the shrubs *could* block the drainage ditch causing water to flood the highway, and a traveler *could* leave the highway striking one of the shrubs. *Id.*

**{¶41}** On appeal, the landowners argued that the director should not be permitted to remove the shrubs, because his decision was based on speculation of what "could" occur. *Id.* at *2. While the appellate court agreed that the engineer's opinion concerning potential, future problems was inadmissible, the appellate court concluded that the director "was not required to prove that drainage problems *will* occur in the future. He was only required to show that he has concluded that the seedlings interfere or *may* interfere with the use or maintenance of the highway." (Emphasis sic). *Id.* at * 2. "Whether the conclusion is correct is irrelevant to the [director's] authority to remove the seedlings," according to the court. *Id.* The court further stated that the director's "judgment that the shrubs should be removed, and his order to remove them, are matters within the scope of his statutory discretion" with which a court should not interfere absent fraud or a gross abuse of discretion. *Id.* at *4. The court in *Lamborn* ultimately concluded that the director's decision was within the scope of his statutory authority. *Id.*

**{¶42}** The court's decision in *Lamborn* affirms the general view that the public authority has broad discretion to order the removal of obstructions in the

highways. R.C. 5515.02, the statute at issue in *Lamborn*, provided operative language similar to the statute at issue here:

> All individuals, firms, and corporations using or occupying any part of a road or highway on the state highway system, or the bridges or culverts thereon, with * * * any object or structure, other than by virtue of a franchise or permit granted and in force, shall remove from the bounds of the road, highway, bridge, or culvert, their * * * objects or structures, when in the opinion of the director of transportation they constitute obstructions in such roads, highways, bridges, or culverts, or interfere or may interfere with the contemplated construction, reconstruction, improvement, maintenance, or repair of such roads, highways, bridges, or culverts thereon, or interfere or may interfere with the use of such roads, highways, bridges, or culverts thereon, by the traveling public. (Eff. Sept. 28, 1973).[7]

{¶43} Like the statute in this case, R.C. 5515.02 had three independent clauses authorizing the director to order the removal of an object or structure from the bounds of a highway, and all three clauses were modified by the phrase "when in the opinion of the director of transportation," similar to R.C. 5547.03's "when

---

[7] The version enacted in 1953, when the General Assembly switched from the General Code to the Ohio Revised Code, contained this same applicable language.

-25-

in the opinion of the board of county commissioners" modifying phrase.[8]  While R.C. 5515.02's second clause was broader than 5547.03's because it included "maintenance or repair," two reasons not listed in 5547.03, both statutes provide a third clause authorizing removal of objects or structures that "interfere or may interfere" with the traveling public's use of the highways, bridges, or culverts.  In light of the statutes' similar wording and subject matter, *Lamborn* persuades us that R.C. 5547.03 provides the board of county commissioners broad authority to remove obstructions and interferences from highways, bridges, and culverts.

{¶44} In this case, the county engineer opined that Toledo Edison's utility poles were not in compliance with several roadside design guides and negatively impacted the county's ability to plow snow off the shoulder of the road to prevent drifting.  (Ex. C).  In its December 15, 2011 letter, the board of county commissioners stated that the utility poles were closer to the road than permitted by the AASHTO Road Design Guide and the ODOT Location and Design Manual.  (Ex. B).  Furthermore, the county engineer also notified the commissioners that other utility companies, like AEP and Northwest Electric, moved their utility poles at the county's request.  (Ex. C).  Toledo Edison did not offer testimony at the administrative hearing, but instead argued *Turner* and

---

[8] In 1998, R.C. 5515.02 was amended to provide, in pertinent part "* * * or interfere or may interfere with the contemplated construction, reconstruction, improvement, maintenance, or repair of the roads, highways, bridges, or culverts or with their use by the traveling public." (Eff. Sept. 16, 1998).  The statute was amended again, in pertinent part, to provide "* * * or use by the traveling public of the roads or highways." (Eff. Apr. 5, 2001).  Unlike R.C. 5515.02, 5547.03 has never been amended since its initial passage in 1953.

submitted, without objection, materials that included diagrams with measurements of the utility pole locations. (Exs. B, C).

**{¶45}** In light of the common, ordinary meaning of "obstruction," R.C. 5547.03's broad statutory language, *Steigerwald*, *Lamborn*, and Ohio Attorney General Opinion No. 80-043, we conclude that Toledo Edison's utility poles could, in the opinion of the county commissioners, constitute "obstructions" subject to ordered-removal. The trial court erred as a matter of law and, therefore, abused its discretion, by relying on *Turner* to interpret "obstruction" more narrowly than its common, ordinary meaning. Furthermore, the trial court failed to observe what that Court in *Turner* did observe—that the General Assembly has delegated to public authorities (municipalities, counties, and the State director of transportation) the authority to approve the location of utility poles within the road right-of-way in the interest of public safety. 2008-Ohio-2010, at ¶ 20. The utility companies in *Turner* were not liable precisely because the State director of transportation had approved the utility pole location, and his approval was "indicative that the object was not an obstacle to the traveling public." *Id.* The Court in *Turner* recognized that the public authority would consider a variety of factors when considering the location of a utility pole. *Id.* at ¶ 15, 20.

**{¶46}** The Board of Defiance County Commissioners exercised authority that the General Assembly has affirmatively delegated to it and authority that the

Ohio Supreme Court in *Turner* approved—it reevaluated the location of Toledo Edison's utility poles after a road-widening project with an eye toward public safety. The board did not act outside of its authority under R.C. 5547.03 when it determined that Toledo Edison's utility poles constituted obstructions. Once the board determined that the utility poles were obstructions, Toledo Edison was permitted to obtain the board's consent and approval to relocate their poles "in such manner as the board prescribes." R.C. 5547.03. Resolution No. 12-01-058 specifically ordered Toledo Edison to either remove their poles or relocate them "to a location approved by the Defiance County Engineer." (Doc. No. 1, attached).

{¶47} Additionally, Toledo Edison, like the landowners in *Steigerwald*, failed to rebut the county engineer's opinion that their utility poles obstructed (impeded) snow removal. The county engineer testified that part of the roadway improvements included installing a wider roadway shoulder for the purpose of plowing back snow to reduce drifting. (Ex. C). The county engineer testified that the proximity of Toledo Edison's utility poles to the edge of the road "limit[s] the ability to plow back * * * the full length" of the shoulder. (*Id.*). The county commissioners' finding that the utility poles interfered with snow removal is equivalent to a finding that the utility poles "interfere or may interfere" with "the use [of such highways, bridges, or culverts] by the traveling public," although not

-28-

labeled as such. R.C. 5547.03[A][2]. Therefore, snow removal was an independent justification for the county commissioners' decision to order the removal of Toledo Edison's utility poles. Toledo Edison did not present any evidence to rebut the county engineer's testimony in this regard.

{¶48} Our decision is not only consistent with the R.C. 5547.03's broad statutory language, analogous statutory provisions, case law, and the opinion of Ohio's Attorney General but also the public policy of permitting public utility companies access to publicly owned road rights-of-way subject to the approval of the applicable public authority. *See* R.C. 723.01 (municipalities authority to govern roadways), 4939.03 (consent of municipality necessary to occupy/use the bounds of the highway), 5547.04 (county commissioners' authority to remove obstructions; consent and approval to occupy/use the bounds of the highway), 5515.01 (state director of transportation's authority to issue permits to occupy/use state highways); *Turner*, 2008-Ohio-2010. The factors that public authorities consider for the initial placement or the removal/relocation of objects and structures within the right-of-way are best determined and evaluated by those officials who are not only aware of the particular circumstances concerning the location but responsible for maintaining the roadways. *See* R.C. 5535.01 (classifying types of highways and setting forth the public authority responsible). The judiciary should not overturn a public authority's decision in these matters

unless the decision fails to meet R.C. 5547.03's statutory criteria, or it fails to meet the standards for administrative appeals pursuant to R.C. 2506.03 and 2506.04.

{¶49} As a final matter, we want to address a concern voiced in the trial court's opinion and echoed at oral argument by Toledo Edison—whether the board of county commissioners has "unbridled" discretion under R.C. 5547.03 to order the removal of an object of structure it categorizes as an "obstruction" in the highway. This question is answered by the statutory language, itself, with a simple "no." While the modifying phrase "in the opinion of the board of county commissioners" results in broad discretion, it is not "unbridled." The language of the statute sets forth three, independent bases for the board of county commissioners to order removal—their decision must rest on one or more of these bases. As the trial court recognized, the board's decision is still subject to administrative appeal where the trial court can determine whether its removal order was "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." *Henley*, 90 Ohio St.3d at 147; R.C. 307.56; 2506.01(A).

{¶50} While the Board of Defiance County Commissioners could have provided *more* reasoning behind its decision, Toledo Edison failed to present any rebuttal evidence, besides its packet of materials. From Toledo Edison's perspective, the answer in this case was a legal one, not a factual one, which is the

best explanation for why it failed to offer any testimony at the hearing. From its perspective, the utility poles were located off the improved portion of the highway, and therefore, were not "obstructions" under R.C. 5547.03. We have rejected this categorical rule of law.

{¶51} Because the trial court erred as a matter of law and, therefore, abused its discretion by relying on *Turner* to interpret "obstruction" in R.C. 5547.03 more narrowly than its common, ordinary meaning, and the record contains a preponderance of substantial, probative evidence supporting the board of county commissioners' opinion that Toledo Edison's utility poles were obstructions in the highway *and* that the utility poles interfered or may interfere with the use of the highway by the traveling public, we sustain the first and third assignments of error and reverse the decision of the trial court vacating Resolution No. 12-01-058.

## Assignment of Error No. II

**The trial court erred by impermissibly substituting its judgment for that of the commissioners.**

{¶52} In their second assignment of error, the commissioners argue that the trial court impermissibly substituted its judgment for theirs despite the limited review under R.C. 2506.04. In particular, the commissioners argue that the trial court engaged in a "how close is too close to constitute an obstruction" analysis inconsistent with the trial court's duty to presume regularity and defer to an agency's determination.

**{¶53}** In light of our decision to sustain the first and third assignments of error raised by the Board of Defiance County Commissioners, this assignment of error is moot, and we decline to address it further. App.R. 12(A)(1)(c).

**{¶54}** Having found error prejudicial to the appellant in the first and third assignments of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**